PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 17-3500 & 18-1182

———————

ANDREW WOLFINGTON, individually and on behalf of all
others similarly situated,
Appellant

v.

RECONSTRUCTIVE ORTHOPAEDIC ASSOCIATES II
PC, a/k/a the Rothman Institute; ROTHMAN INSTITUTE;
DOES 1 THROUGH 10, inclusive

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No.: 16-cv-04935)
District Judge:  Michael M. Baylson

———————

Argued: October 23, 2018

(Opinion filed:  August 20, 2019)


Before:  KRAUSE, COWEN, and FUENTES, *Circuit Judges*

Peter H. LeVan, Jr.   [ARGUED]
LeVan Law Group
130 North 18th Street
One Logan Square, 27th Floor
Philadelphia, PA 19103
            *Counsel for Appellant*

Laura D. Ruccolo    [ARGUED]
Capehart Scatchard
8000 Midlantic Drive
Laurel Corporate Center, Suite 300S
P.O. Box 5016
Mount Laurel, NJ 08054
            *Counsel for Appellee*

-------------------

OPINION OF THE COURT

-------------------

FUENTES, <u>Circuit Judge</u>

This is an appeal from the District Court's entry of judgment on the pleadings against appellant-plaintiff Andrew Wolfington on his claim under the Truth in Lending Act[1] ("the Act"). Wolfington's claim under the Act stems from reconstructive knee surgery he received from defendant-appellee Reconstructive Orthopaedic Associates II PC, also known as the Rothman Institute ("Rothman"). Wolfington alleged that Rothman failed to provide disclosures required by the Act when it permitted him to pay his deductible in monthly installments following surgery. The District Court entered

-------------------

[1] 15 U.S.C. § 1601 *et seq*.

2

judgment on Wolfington's claim because it determined he had failed to allege that credit had been extended to him in a "written agreement," as required by the Act's implementing regulation, Regulation Z.[2]  After entering judgment, the District Court also *sua sponte* imposed sanctions on Wolfington's counsel.  Because we agree that Wolfington failed to adequately allege the existence of a written agreement, but conclude that counsel's investigation and conduct were not unreasonable, we affirm in part and reverse in part.

## I.    Background

Because the District Court granted judgment on the pleadings,[3] we accept the well-pled allegations in Wolfington's Complaint as true.  Those allegations may be summarized as follows:

### A.    Wolfington's Surgery

Wolfington agreed on January 12, 2016 to have surgery provided by Rothman, scheduled for January 21, 2016.  As part of the January 12 agreement, Wolfington signed a document titled "Financial Policy."[4]  The Policy provided that Wolfington agreed to pay any outstanding deductible not

---

[2] 12 C.F.R. § 226.1 *et seq*.

[3] *See* JA 16-18, JA 18 n.6.  Because the District Court also purported to grant summary judgment in the alternative, we note facts outside the pleadings as appropriate.

[4] JA 87; Financial Policy, Mot. J. Pleadings Ex. A, *Wolfington v. Reconstructive Orthopaedic Assocs., II, P.C.*, No. 16-cv-4935 (E.D. Pa. Nov. 7, 2016), ECF No. 10-4 at 5.

covered by his insurance before his surgery took place. The day before Wolfington's surgery, however, Wolfington's father informed Rothman that Wolfington was unable to pay his deductible, then around $2,000. Rothman orally agreed to accept a $200 "initial payment" by Wolfington and to permit him to pay the remaining deductible in monthly installments of $100 (the "January 20 Agreement").[5] Wolfington received two emails on January 20, one confirming the $200 payment and the other confirming the establishment of the payment plan and listing the credit card to which payments would be charged. The Complaint quotes both emails in full. Wolfington had surgery as scheduled, but subsequently failed to make any further payments on his outstanding deductible.

## B.    Proceedings in the District Court

Wolfington filed a putative class action in the District Court, alleging that Rothman had extended him credit in the January 20 Agreement, subject to the Truth in Lending Act, but failed to provide disclosures required by the Act. The Complaint set forth two claims, including one for violation of the Act. His second claim, for violation of the Electronic Funds Transfer Act, was later withdrawn. Rothman filed an Answer with counterclaims for breach of contract and a Motion for Judgment on the Pleadings, which included a copy of the Financial Policy, along with other documents.

Prior to issuing its decision on Rothman's Motion, the District Court conducted a six-minute telephone conference with the parties on the record on December 14, 2016.[6] During

---

[5] JA 87.
[6] *Cf.* JA 100, JA 104.

4

that telephone conference, the District Court addressed two factual issues with the parties. First, the District Court confirmed that Wolfington had made no payments pursuant to the January 20 Agreement. Second, the District Court asked if there was "anything in writing confirming this arrangement?"[7] Wolfington's counsel replied, "[T]he only information that we have is the confirmation receipts with respect to an online bill payment plan . . . that indicated the $100 a month payments."[8] Defense counsel then stated, "That's correct . . . . There's no signed agreement by the plaintiff to make the payments."[9]

Eight days after the telephone conference, the District Court granted Rothman's Motion. In granting the Motion, the District Court first determined that it could properly rely on the Financial Policy, reasoning that the allegations in the Complaint referenced and relied on it. The District Court also relied on counsel's statement at oral argument, stating, "[U]nder the concession of Plaintiff's counsel . . . there is no longer any dispute as to any material fact, establishing that there was no finance charge and no 'written agreement' between the parties."[10] Based on that evidence, the District Court concluded that Wolfington failed to allege the existence of a written agreement for the extension of credit.

In its memorandum, the District Court framed its decision as a judgment on the pleadings under Rule 12(c). The District Court analyzed Wolfington's claims only under the standard for Rule 12(c) and provided no substantive analysis

---

[7] JA 101.
[8] JA 101-02.
[9] JA 102.
[10] JA 28.

of the standard for summary judgment under Rule 56. Pursuant to Rule 12(c), the District Court declined to consider "certain documents" Rothman attached to its Motion in order to avoid "converting the instant Motion into one for summary judgment."[11] After determining it would grant judgment on the pleadings, however, the District Court stated, "Alternatively, Defendant's motion will be converted into one for summary judgment, pursuant to Rule 12(d), which will also be granted."[12] Wolfington moved for reconsideration under Rule 59(e), which the District Court denied.

In granting Rothman's Motion, the District Court also *sua sponte* initiated sanctions proceedings under Rule 11 against Wolfington's counsel. Prior to imposing sanctions, the District Court accepted declarations from Wolfington's counsel, conducted a hearing, and received supplemental briefing. The District Court concluded that sanctions in the form of attorneys' fees were appropriate, reasoning that counsel could have reasonably discovered both the lack of a written agreement and Wolfington's failure to make any payments on the deductible before filing the Complaint. Ultimately, the District Court imposed sanctions under Rule 11 of $38,447.91. The sanctions were imposed solely for

---

[11] JA 18.

[12] JA 28. The District Court's later descriptions of its December 2016 entry of judgment on the pleadings further muddled the standard it chose to apply. In its September 2017 memorandum imposing sanctions under Rule 11, the District Court described Rothman's Motion for Judgment on the Pleadings both as "pursuant to Rule 12(c) because it attached factual materials" and "as a Rule 56 motion [upon which] summary judgment was entered for" Rothman. JA 41, 43.

6

Wolfington's claim under the Truth in Lending Act, and not for the withdrawn claim under the Electronic Funds Transfer Act, although the District Court stated it retained the authority to impose sanctions on the withdrawn claim.

## II.     Discussion[13]

On appeal, Wolfington challenges the District Court's entry of judgment on the pleadings under Rule 12(c) and imposition of sanctions under Rule 11. For the reasons below, we conclude that Wolfington has failed to adequately allege a violation of the Truth in Lending Act, but that his counsel's investigation and conduct were not unreasonable. We therefore affirm the entry of judgment on the pleadings and reverse the imposition of sanctions.

### A.     Truth in Lending Act

First, Wolfington challenges the District Court's entry of judgment on the pleadings on his claim under the Truth in Lending Act. In particular, Wolfington contends that (1) the District Court erred under Rule 12(c) by considering material outside the pleadings—namely, counsel's purported concession that there was no written agreement—and, (2) he has adequately alleged (a) the extension of credit, (b) the

---

[13] We have jurisdiction to review the District Court's final judgment pursuant to 28 U.S.C. § 1291. The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. Wolfington also alleges that this Court has jurisdiction pursuant to 28 U.S.C. § 158(d). That provision, however, is applicable only to appeals from the final judgments of bankruptcy courts. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995).

7

consummation of a credit transaction, and (c) a written agreement. Although we conclude the District Court erred in considering material outside the pleadings, we affirm the entry of judgment on the pleadings because Wolfington has failed to allege the existence of a written agreement, as required by Regulation Z.

### 1. *Applicable Law*

#### (a) Judgment on the Pleadings

A motion for judgment on the pleadings under Rule 12(c) "is analyzed under the same standards that apply to a Rule 12(b)(6) motion."[14] Consequently, the court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party," and may not grant the motion "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."[15] Thus, in deciding a motion for judgment on the pleadings, a court may only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[16]

If the court considers matters outside pleadings other than documents "integral to or explicitly relied upon in the

---

[14] *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

[15] *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)).

[16] *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

complaint,"[17] the "motion must be treated as one for summary judgment under Rule 56."[18] Conversion of a motion under Rule 12 to one for summary judgment requires that "the procedures of Rule 56 govern."[19] Those procedures include providing the parties at least ten days' notice and the opportunity to submit evidence of record to support or oppose summary judgment.[20] Review on appeal is *de novo*.[21]

### (b) Truth in Lending Act

Wolfington brings his sole remaining claim under the Truth in Lending Act[22] and its implementing regulation promulgated by the Federal Reserve Board, Regulation Z.[23]

---

[17] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation mark and emphasis omitted) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[18] Fed. R. Civ. P. 12(d).

[19] *Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir. 1989).

[20] *Id.*

[21] *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017).

[22] 15 U.S.C. § 1601 *et seq*.

[23] 12 C.F.R. § 226.1 *et seq*. Primary authority for enforcement of the Act was transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau in 2010. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1100A(1), 124 Stat. 1376, 2107 (codified in part at 15 U.S.C. § 1602(b)). The Bureau's regulations are codified in Part 1026 of Title 12 of the Code of Federal Regulations and are materially identical to those promulgated by the Board for purposes of this appeal. Unless noted

The Act and Regulation Z require a "creditor" extending credit to make certain disclosures[24] before the "consummation" of the credit transaction.[25]

To be subject to the Act's disclosure requirements, a lender must qualify as a "creditor" both in general and in the particular challenged transaction.[26] Under Regulation Z, a creditor is a person "who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a down payment)" and to whom the debt in dispute "is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."[27] "Credit" is "the right to defer payment of debt or to incur debt and defer its payment."[28]

---

otherwise, we will refer to both agencies collectively as "the Board."

[24] 15 U.S.C. § 1638(a).

[25] 46 Fed. Reg. 50,288, 50,323 (Oct. 9, 1981), *as reprinted in* 12 C.F.R. pt. 226, supp. I, cmt. 17(b) (2012), *available at* https://www.govinfo.gov/content/pkg/CFR-2012-title12-vol3/pdf/CFR-2012-title12-vol3-part226-appI-id377.pdf; *cf. Bartholomew v. Northampton Nat'l Bank*, 584 F.2d 1288, 1296 (3d Cir. 1978) ("The Truth-In-Lending Act requires that creditors make full disclosure prior to the extension of credit.").

[26] *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 411 (3d Cir. 2000).

[27] 12 C.F.R. § 226.2(a)(17)(i). The parties agree that Rothman did not extend credit subject to a finance charge.

[28] *Id.* § 226.2(a)(14).

10

Under Regulation Z, in the Federal Reserve Board staff's view, a written credit agreement requires more than an "informal workout arrangement" of debt or "a unilateral written communication by either the creditor or the customer."[29]  Instead, a written agreement requires "some new evidence of indebtedness executed by the customer, such as a new note, contract or other form of written agreement."[30]  However, the requirement of a written agreement is not satisfied by a "letter that merely confirms an oral agreement."[31]

Once an entity qualifies as a creditor, it must make the required disclosures before the "consummation" of the credit transaction.[32]  A credit transaction is consummated when the "consumer becomes contractually obligated on a credit transaction."[33]

It is under this law that we consider Wolfington's appeal.

2.  *The District Court Erred in Entering Judgment on the Pleadings or, in the Alternative, Summary Judgment*

Wolfington first argues that the District Court improperly relied on counsel's purported admission during the December 14, 2016 telephone conference that there was no

---

[29] Part 226—Truth in Lending Official Staff Interpretations, 42 Fed. Reg. 40,424, 40,425 (Aug. 10, 1977).

[30] 42 Fed. Reg. at 40,425.

[31] 46 Fed. Reg. at 50,293, *as reprinted in* 12 C.F.R. pt. 226, supp. I, cmt. 2(a)(17).

[32] 46 Fed. Reg. at 50,323.  Rothman does not dispute that it did not make the required disclosures.

[33] 12 C.F.R. § 226.2(a)(13).

written agreement between the parties. Wolfington is correct, for three reasons.

First and foremost, the admission was a "matter[] outside the pleadings"[34] and improperly considered in deciding a motion for judgment on the pleadings. Motions for judgment on the pleadings under Rule 12(c) are considered under the same standard as motions to dismiss under Rule 12(b)(6),[35] and it is well established that a motion to dismiss may be decided based only on the "complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[36] Although the District Court stated that it accepted the facts of Wolfington's Complaint as true and that it did not consider matters outside the pleadings,[37] it nonetheless expressly relied on counsel's purported admission during oral argument, stating, "[U]nder the concession of Plaintiff's counsel . . . there is no longer any dispute as to any material fact."[38] Because the District Court relied on matters outside the pleadings, it erred in entering judgment on the pleadings.

We have previously determined that admissions by counsel at oral argument may not support dismissal under Rule 12(b)(6). In *Schmidt v. Skolas*, we reversed the dismissal of a suit for breach of fiduciary duty based on an admission by

[34] Fed. R. Civ. P. 12(d).
[35] *Revell*, 598 F.3d at 134.
[36] *Mayer*, 605 F.3d at 230.
[37] JA 13, JA 18 n.6.
[38] JA 28.

12

counsel.[39]  In that case, counsel admitted at oral argument that the relevant conduct occurred outside the applicable statute of limitations.[40]  The dissent argued that the plaintiff should have been bound by counsel's admission.[41]  The majority, however, reversed the dismissal, reasoning that where "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal," despite counsel's admission.[42]    Similarly, in *Bruni v. City of Pittsburgh*, we concluded that the District Court erred in granting a motion to dismiss based "upon testimony given at the [previous preliminary injunction] hearing and the supplemental declarations filed by" the parties.[43]  Thus, in this case, the District Court improperly considered counsel's purported admission.

---

[39] *Schmidt*, 770 F.3d at 249-50; *id.* at 254 (Rendell, J., dissenting).

[40] *Id.* at 254 (Rendell, J., dissenting).

[41] *Id.* at 255 & n.3.

[42] *Id.* at 251 (majority opinion) (alteration in original) (quoting *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011)); *accord Baker v. Putnal*, 75 F.3d 190, 197 (5th Cir. 1996) ("In effect, the trial court adopted portions of the defendants' claims as fact without acknowledging any contradiction with the complaint. . . . In so doing, the court failed to apply the standards of Rule 12(b)(6).  Dismissal under these circumstances was error.")

[43] 824 F.3d 353, 361 (3d Cir. 2016).

Second, an admission must be "unequivocal" to be binding.[44]  Ordinarily, an "admission of counsel during the course of trial is binding on his client."[45]  "However, to be binding . . . admissions must be unequivocal."[46]  Counsel's purported admission was not.  As noted above, the District Court asked, "[I]s there anything in writing confirming this arrangement?"[47]  Wolfington's counsel responded that "the only information that we have is the confirmation receipts with respect to an online bill payment plan . . . that indicated the $100 a month payments."[48]  Counsel for *Rothman* then stated, "That's correct . . . . There's no signed agreement by the plaintiff to make the payments."[49]  Notably, in imposing sanctions later, the District Court placed emphasis on the statement by Rothman's counsel, not Wolfington's.[50]  The statement by Wolfington's counsel did not amount to an "unequivocal" admission that there was no written agreement, and the District Court's reliance on the statement as a binding admission was improper.

---

[44] *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) 1291 (citing *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880)).

[45] *Id.* (citing *Rhoades, Inc. v. United Air Lines, Inc.*, 340 F.2d 481 (3d Cir. 1965)); *accord Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) (stating that a client may be bound by counsel's admissions in "pleadings or briefs").

[46] *Glick*, 458 F.2d at 1291 (citing *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880)).

[47] JA 101.

[48] JA 101-02.

[49] JA 102.

[50] JA 42.

Third and finally, to the extent that the District Court converted Rothman's Motion for Judgment on the Pleadings into one for summary judgment under Rule 12(d),[51] it failed to provide Wolfington with the required notice. In particular, the District Court was required to allow "the parties [to] have at least ten days['] notice" before converting the Motion under Rule 12(d).[52] "Although notice need not be express, we have recommended that district courts provide express notice because it 'is easy to give and removes ambiguities.'"[53]

Here, Wolfington had insufficient notice of the conversion to summary judgment. The District Court entered judgment only eight days after counsel's purported admission during the December 14, 2016 telephone conference, and it gave no indication during that conference that it was considering converting the Motion to one for summary judgment. Further, Rothman's motion was captioned only as a "Motion for Judgment on the Pleadings or in the Alternative to Bifurcate Discovery,"[54] and it was only in Rothman's Reply Brief in Support of Its Motion Under Federal Rule 12(c) that the possibility of conversion was raised.[55] Nowhere in the record before us did the District Court acknowledge that

---

[51] JA 28 ("Alternatively, Defendant's motion will be converted into one for summary judgment, pursuant to Rule 12(d) . . . .").
[52] *Rose*, 871 F.2d at 340.
[53] *Bruni*, 824 F.3d at 360 n.9 (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 288 n.11 (3d Cir. 1999)).
[54] JA 74.
[55] Reply Br. at 2, *Wolfington v. Reconstructive Orthopaedic Assocs. II, P.C.*, No. 16-cv-4935 (E.D. Pa. Dec. 5, 2016), ECF No. 17.

15

possibility.  That was insufficient notice of conversion under Rule 12(d).

### 3. *Because Wolfington Failed to Sufficiently Plead the Existence of a Written Agreement, the District Court's Error Was Harmless*

Despite the erroneous conversion of the Motion for Judgment on the Pleadings into one for summary judgment, we conclude that that error was harmless.  A district court's "failure to give adequate notice [under Rule 12(d)] does not . . . require automatic reversal."[56]  Instead, the error may be excused if the complaint likewise failed to state a claim under Rule 12(b)(6), rendering the district court's failure "harmless error."[57]

Rothman raises three arguments that Wolfington failed to state a claim under the Truth in Lending Act:  (a) there was no extension of "credit" by Rothman to Wolfington; (b) any extension of credit was not "consummated" under the Act; and, (c) any credit agreement was not in writing.  We conclude that, although Wolfington has sufficiently pled the extension of credit and consummation of the credit transaction, he failed to plead the existence of a written agreement.

### (a) Extension of credit

The parties first dispute whether Wolfington's arrangements with Rothman constituted an extension of

---

[56] *Rose*, 871 F.2d at 342.

[57] *Id.*; *accord Bruni*, 824 F.3d at 361-62.

"credit." As noted above, under Regulation Z, "credit" is "the right to defer payment of debt or to incur debt and defer its payment."[58] The parties' dispute centers on whether Wolfington's arrangements were merely an informal workout agreement of "preexisting" debt, a requirement they believe is established by the Seventh Circuit's decision *Bright v. Ball Memorial Hospital*.[59] We ultimately conclude that the presence of "preexisting" debt is irrelevant under the Act and that the arrangements between Wolfington and Rothman constituted an extension of credit.

In *Bright*, which pre-dated the most relevant amendments to Regulation Z, the Seventh Circuit concluded that payment arrangements between a hospital and two former patients were not subject to the Act. The *Bright* court affirmed the dismissal of the plaintiff-debtors' Truth in Lending claims on two grounds. First—and discussed more fully below—it concluded that some of the credit transactions were not "consummated" because there was no evidence that the debtors accepted the payment terms offered by the hospital.[60] Second—and bearing on this issue—the *Bright* court concluded that two of the debtors' transactions did not constitute an extension of credit.[61] Instead, it determined the transactions were "an informal workout arrangement,"[62]

---

[58] 12 C.F.R. § 226.2(a)(14).

[59] 616 F.2d 328, 333 (7th Cir. 1980).

[60] *Id.* at 333-34. We address Rothman's contention that Wolfington's credit transaction was not "consummated" below.

[61] *Id.* at 334.

[62] *Id.* (quoting 42 Fed. Reg. at 40,425).

pursuant to a 1977 Federal Reserve Board interpretation of an older version of Regulation Z.

That interpretation provided that the Act's requirements are applicable only to "formal written workout arrangement[s]," which "involve some new evidence of indebtedness executed by the customer, such as a new note, contract or other form of written agreement."[63]  In contrast, "an informal workout arrangement" does not trigger the Act's requirements.[64]  Because the debtors' agreements with the hospital "were reached without a new written evidence of [their] indebtedness," the *Bright* court concluded they were merely an informal workout arrangement and not an extension of credit.[65]

Pursuant to *Bright*, Rothman and Wolfington dispute at length whether the January 12 Financial Policy created a "preexisting debt" and whether the subsequent January 20 Agreement was merely an "informal workout arrangement" of that debt.[66]

We believe that dispute is misplaced because whether debt is "preexisting" is irrelevant under both *Bright* and the Act.  The critical issue in *Bright* was not whether the debt was

---

[63] 42 Fed. Reg. at 40,425 (citing 12 C.F.R. § 226.2(p) (1977) (defining "consumer credit")).

[64] *Id.*

[65] 616 F.2d at 335.

[66] Appellee Br. at 9 ("The District Court correctly concluded that under the facts as pled Rothman did not extend credit but instead attempted to collect a pre-existing debt."); *id.* at 14-15, 17-20, 24; Reply at 14-17.

"preexisting" but the level of formality required to establish an extension of credit.[67] In defining that level of formality, the *Bright* court relied on the Federal Reserve Board's 1977 staff interpretation, which contrasted the extension of credit in a formal "written" agreement with an "informal workout arrangement."[68] There was no extension of credit in that case, not because the debt was preexisting, but because there were no formal written "evidence" of the credit transaction.[69] Thus, in *Bright,* the presence of "preexisting" debt was entirely irrelevant to a claim under the Act.

Likewise, the presence of "preexisting" debt is irrelevant under the plain text of the Act and Regulation Z, amended since *Bright*, as well. As noted above, the Act defines credit as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[70] That "definition contemplates that one who confers a right to pay a pre-existing debt in more than four installments will be a 'creditor.'"[71] Limited to Wolfington's pleadings, we conclude he has sufficiently pled that he was conferred such a right. He alleges that Rothman permitted him to pay off the remaining deductible stemming from his surgery at the rate of $100 per month. Because the Act reaches extensions of credit to defer payment of both preexisting and newly incurred debts, it is irrelevant whether the January 12 Financial Policy created a

---

[67] 616 F.2d at 334.

[68] 42 Fed. Reg. at 40,425.

[69] 616 F.2d at 334 (quoting 42 Fed. Reg. at 40,425).

[70] 15 U.S.C. § 1602(f); *accord* 12 C.F.R. § 226.2(a)(14) ("Credit means the right to defer payment of debt or to incur debt and defer its payment.").

[71] *Pollice*, 225 F.3d at 413.

debt or not. Thus, we conclude that Wolfington has sufficiently pled an extension of "credit."

In reaching that conclusion, we part ways with the *Bright* court in analyzing whether a written agreement is required for an extension of "credit." At the time of the *Bright* decision, a written agreement was required only by the Federal Reserve Board's 1977 staff interpretation.[72] However, that requirement was expressly added to Regulation Z in 1981, when the Federal Reserve Board opted to include it under the definition of "creditor."[73] Consequently, we conclude that the contrast between a formal "written" agreement and an "informal workout" of preexisting debt is better analyzed, *infra*, under Rothman's argument that Wolfington failed to plead a written agreement under the definition of "creditor."

### (b) Consummation

Second, Rothman and Wolfington dispute whether the extension of credit was "consummated" under the Act. As noted above, a creditor must make the Act's required disclosures before "consummation" of the credit transaction; a credit transaction is "consummated" only at "the time that a consumer becomes contractually obligated on a credit

---

[72] *Compare* 42 Fed. Reg. at 40,425, *with* 12 C.F.R. § 226.2(s) (1981).

[73] 46 Fed. Reg. 20,848, 20,851 (Apr. 7, 1981) ("The definition has also been revised to require, if there is no finance charge, that there be a written agreement to pay in more than four installments, in order for a person offering credit to be considered a creditor. This is narrower than in the current regulation, which covers both oral and written agreements.").

transaction."[74]   Under an older version of that requirement,[75] the *Bright* court concluded that the credit transactions in that case were not consummated.[76]   It reached that conclusion because the debtors' sporadic payments were "clearly not responsive to either of th[e] work-out agreements" offered by the hospital.[77]   Because the patients in *Bright* never responded to the hospital's offered payment plans, they never manifested assent to the proposed agreements.[78]   Consequently, the court concluded that there was no contractual relationship between the parties and the credit transaction was never consummated.[79]

We conclude that, unlike the transactions in *Bright*, the January 20 Agreement was consummated.  The court in *Bright* concluded that there was insufficient evidence of a binding contractual agreement to constitute "consummation" of the credit transaction.  Based solely on the pleadings, however, we conclude that Wolfington sufficiently pled the formation of a contractual agreement:  offer, acceptance, and "mutual assent to essential terms."[80]   He pled that he reached a payment agreement with Rothman that involved a down payment and monthly installments "until the balance of the deductible was fully satisfied."[81]

---

[74] 12 C.F.R. § 226.2(a)(13).

[75] *Id.* § 226.2(kk) (1980).

[76] 616 F.2d at 333.

[77] *Id.*

[78] *Id.* at 333-34.

[79] *Id.*

[80] *Flender Corp. v. Tippins Int'l, Inc.*, 830 A.2d 1279, 1284 (Pa. Super. Ct. 2003).

[81] JA 87.

In response, Rothman raises three arguments, none of which is availing. First, it argues that Wolfington did not enter into a contractual agreement because he never "signed any written document agreeing to make payments."[82] Rothman misconstrues the requirements for formation of a "legally binding contract."[83] It is black-letter law that, as a general matter, no signed document is required to create a contractual obligation. Instead, the exchange of promises to perform is sufficient to form a contract.[84] Wolfington has pled such an exchange. This is sufficient, on a motion for judgment on the pleadings, to infer the existence of a contractual agreement.

Second, Rothman relies on *Bright* to argue that there was no contractual agreement because there was "no new indebtedness"[85] as a result of Rothman and Wolfington's oral

---

[82] Appellee Br. at 15; *see also id.* at 16-17 ("Consummation occurs when the plaintiff becomes legally obligated on the 'debt.' Here, the only document legally obligating Plaintiff was the written Agreement of January 12, 2016." (citations omitted)); *id.* at 21.

[83] *Id.* at 16.

[84] *See Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1195 (Pa. Super. Ct. 1987). The Federal Reserve Board's Official Staff Commentary on Regulation Z provides that state law governs the consummation of a credit transaction, stating: "State law governs. When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination." 46 Fed. Reg. at 50,292.

[85] Appellee Br. at 17; *see also id.* at 20 ("Plaintiff was not extended credit, Plaintiff was provided an alternative to pay a

exchange—in other words, that the debt was "preexisting."[86] This argument is unavailing for the reasons described above—the Act plainly "contemplates that one who confers a right to pay a pre-existing debt in more than four installments will be a 'creditor.'"[87] Thus, it is irrelevant that the debt was preexisting so long as the agreement conferred a right to postpone payment of that debt in four or more installments. As determined above, Wolfington has sufficiently pled that he was contractually conferred such a right.

Finally, Rothman relies on *Bright* to argue there was no contract formed between the parties because Wolfington failed to make payments toward his deductible.[88] That argument misconstrues the analysis in *Bright* of the debtors' payments. As described above, the *Bright* court analyzed the debtors' payments, not because payments were required to form a contract, but because it was analyzing whether there was evidence that the debtors accepted the terms of repayment offered by the hospital. Despite Rothman's arguments, *Bright* does not require payments to contractually consummate a credit transaction, but merely recognizes that performance may be evidence of acceptance under well-established contract law.[89]

---

debt that was due before his surgery . . . ."); *id.* at 24 ("Defendant contacted [Wolfington] informally to work out a payment arrangement of the existing debt in an informal manner.").

[86] *Id.* at 20.

[87] *Pollice*, 225 F.3d at 413.

[88] Appellee Br. at 13-14, 17-18, 21-24.

[89] Rothman's arguments regarding "no new indebtedness" could potentially be relevant to the existence of consideration

23

## (c)     Writing

Third, the parties dispute whether credit was extended to Wolfington in a "written agreement," as required by Regulation Z.  That dispute requires us to resolve two related issues:    (1) whether Wolfington's allegations satisfy Regulation Z's "written agreement" requirement, and (2) whether the interpretation of that requirement by the Federal Reserve Board staff is entitled to deference from this Court.  We conclude that Wolfington's allegations do not satisfy the staff interpretation and that interpretation is entitled to deference.  Consequently, we will affirm the District Court's grant of judgment on the pleadings.

As relevant here, Regulation Z defines a creditor as a "person who regularly extends consumer credit that . . . is payable by written agreement in more than four installments (not including a down payment)."[90]   The requirement of a formal writing has long been established under the Act and Regulation Z.  Prior to the addition of the "written agreement" requirement to Regulation Z in 1981,[91] the Federal Reserve Board's 1977 staff interpretation instructed that the Regulation's disclosure requirements were not triggered without a "formal written workout arrangement [that] involve[s] some new evidence of indebtedness executed by the

---

underlying Wolfington's contractual agreement.  Rothman, however, has failed to raise any argument regarding consideration on appeal, which it has consequently waived. *See infra* Section II.B.2.

[90] 12 C.F.R. § 226.2(a)(17)(i).

[91] 46 Fed. Reg. at 20,851.

customer, such as a new note, contract or other form of written agreement."[92]

Under that long-standing interpretation, the Board does not consider "a unilateral written communication by either the creditor or the customer (such as a letter confirming matters previously discussed either orally or in writing) [to] render[] a workout arrangement formal and subject to the disclosure requirements of Regulation Z."[93]  A formal agreement is distinct from "informal" agreements such as those "by telephone."[94]  That interpretation was affirmed by the Board after amending Regulation Z to expressly require a "written agreement," explaining that a "letter that merely confirms an oral agreement does not constitute a written agreement."[95]

Based on the requirements of Regulation Z, Rothman contends that Wolfington has failed to allege the existence of written agreement.[96]  Wolfington responds that the January 20 emails either constitute a writing for purposes of Regulation Z

---

[92] 42 Fed. Reg. at 40,425.

[93] 42 Fed. Reg. at 40,425.

[94] *Id.*

[95] 46 Fed. Reg. at 50,293, *as reprinted in* 12 C.F.R. pt. 226, supp. I, cmt. 2(a)(17).  The Consumer Financial Protection Bureau has reissued the Federal Reserve Board staff interpretation verbatim.  12 C.F.R. pt. 1026, supp. I, cmt. 2(a)(17)            (2019),           *available           at* https://www.govinfo.gov/content/pkg/CFR-2019-title12-vol9/pdf/CFR-2019-title12-vol9-part1026.pdf.

[96] Appellee Br. at 25-28.

or are "indicative of a separate written agreement between the parties."[97]

We conclude that, under the staff's interpretation of Regulation Z, Wolfington failed to sufficiently plead the existence of a written credit agreement. Although Regulation Z does not necessarily require the written agreement itself to meet all the formalities of a contractual agreement,[98] the official staff interpretation requires, at the very least, that the agreement be "executed by the customer."[99] Wolfington has failed to allege that he has executed or signed such an agreement. Instead, he merely alleges that the January 20 Agreement was negotiated by his father. Nowhere does he allege that he signed a written agreement, and the January 20 email correspondence was merely "confirming" the "previously discussed" agreement.

Further, any written documents in Rothman's possession would not meet the requirements of the staff's official interpretation. Although it may be reasonable to infer that Rothman has *some* documentation regarding the credit transaction, Wolfington fails to allege that he has signed it. Under the staff's official interpretation, those allegations are insufficient to establish a "written agreement."

In supplemental briefing, however, Wolfington contends that the staff's interpretation of Regulation Z's requirement of a "written agreement" is not entitled to

_____

[97] Appellant Br. at 34.
[98] *See* 12 C.F.R. § 226.2(a)(17)(i) (defining "creditor" "when there is no note or contract").
[99] 42 Fed. Reg. at 40,425.

26

deference from this Court and that we should construe that term *de novo*. Rothman argues that the staff's interpretation is entitled to deference under the Supreme Court's decision *Auer v. Robbins*.[100]

We agree with Rothman with respect to the deference owed to the staff interpretation. In *Auer*, the Supreme Court determined that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'"[101] That basic principle has been stated in a number of permutations, and in *Kisor v. Wilkie*, the Court took "the opportunity to restate, and somewhat expand on, those principles."[102] According to the decision in *Kisor*, *Auer* deference is "rooted" in "a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities."[103] That presumption, "though it is always rebuttable," rests on the inference that

---

[100] 519 U.S. 452 (1997). Although deference to an agency's interpretations of its own regulations is often traced to the Court's decision in *Auer*, the doctrine was first formally articulated in *Bowles v. Seminole Rock & Sand Co.*, 325 U. S. 410 (1945), and existed in the Court's jurisprudence even prior to *Seminole Rock*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019).

[101] *Auer*, 519 U.S. at 461 (internal quotation marks omitted) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).

[102] 139 S. Ct. at 2414.

[103] *Id.* at 2412 (plurality opinion); *accord id.* at 2416 (majority opinion) ("[W]e give *Auer* deference because we presume, for a set of reasons relating to the comparative attributes of courts and agencies, that Congress would have wanted us to.").

"when granting rulemaking power to agencies, Congress usually intends to give them, too, considerable latitude to interpret the ambiguous rules they issue."[104]

That presumption, however, may be rebutted by showing that "an interpretation does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment.'"[105] Thus, an agency's interpretation of a regulation is entitled to deference under *Auer* only if five criteria are met: (1) the regulation must be "genuinely ambiguous" after the court has "exhaust[ed] all the 'traditional tools' of

---

[104] *Id.* at 2412 (plurality opinion); *accord id.* at 2415 (majority opinion) ("[W]hen the reasons for that presumption do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading . . . ." (citation omitted)).  In his supplemental briefing, Wolfington contends that Rothman has forfeited any argument that the staff interpretation is entitled to deference under *Auer*. Wolfington's contention, however, is misplaced.  As the *Kisor* Court noted, deference under *Auer* is a "presumption" regarding congressional intent, which may be rebutted as described below.  Thus, the burden rests on the party challenging the application of *Auer*.  Neither party addressed *Auer* in its opening brief or before the District Court, and the relevant forfeiture here is not Rothman's, but Wolfington's failure to rebut the presumption of deference.  Nonetheless, given our "obligati[on]" to "perform [our] reviewing and restraining functions" under *Auer*, we will consider Wolfington's arguments. *Kisor*, 139 S. Ct. at 2415.

[105] *Kisor*, 139 S. Ct. at 2415 (alteration in original) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

construction"[106]; (2) the interpretation must be "reasonable," falling "within the zone of ambiguity the court has identified after employing all its interpretive tools"[107]; (3) "the character and context of the agency interpretation" must entitle it "to controlling weight"[108] as the agency's "authoritative" or "official position"[109] such as "'official staff memoranda' that were 'published in the Federal Register'"[110]; (4) the agency's "interpretation must in some way implicate its substantive expertise"[111]; and, finally, (5) the "agency's reading of a rule must reflect 'fair and considered judgment,'" that is more than a "convenient litigating position" or a "post hoc rationalizatio[n]."[112]

Those five requirements have been met by the staff interpretation. First, the term "written agreement" is ambiguous. On one hand, the plain text of the term suggests that the extension of credit must be reduced to a fully integrated written instrument.[113] On the other hand, we assume that

[106] *Id.* (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, n. 9 (1984)).
[107] *Id.* at 2415-16.
[108] *Id.* at 2416 (citing *Christopher*, 567 U.S. at 155; *United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001)).
[109] *Id.* (quoting *Mead*, 533 U.S. at 257-259, 258 n. 6 (Scalia, J., dissenting)).
[110] *Id.* (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 n.9, 567 n.10 (1980)).
[111] *Id.* at 2417.
[112] *Id.* (alteration in original) (quoting *Christopher*, 567 U.S. at 155).
[113] *See* Agreement, Black's Law Dictionary (11th ed. 2019) (defining "formal agreement" as "[a]n agreement for which the

legislation and regulations are promulgated "against the background of the total *corpus juris* of the states,"[114] including principles of contract such as the statute of frauds, which requires that a "writing" contain only the essential terms of an agreement.[115]   Neither the Act nor Regulation Z defines a "written agreement."  In light of those conflicting principles—the plain text of the regulation and the background of state law—the term "written agreement" is ambiguous.

---

law requires not only the consent of the parties but also a manifestation of the agreement in some particular form (e.g., a signed writing), in default of which the agreement is unenforceable"); Contract, Black's Law Dictionary (11th ed. 2019) ("A written contract is one which, in all its terms, is in writing.").

[114] *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362-63 (9th Cir. 1997) (quoting *Atherton v. Fed. Deposit Ins. Corp.*, 519 U.S. 213, 218 (1997)); *accord O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 85 (1994) ("Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law.").

[115] *E.g.*, *Trowbridge v. McCaigue*, 992 A.2d 199, 201 (Pa. Super. Ct. 2010); *Strausser v. PRAMCO, III*, 944 A.2d 761, 765 (Pa. Super. Ct. 2008) ("We agree with appellant that the writing requirement of the Statute of Frauds can be satisfied by the amalgam of multiple documents[.]"); *Haines v. Minnock Constr. Co.*, 433 A.2d 30, 33 (Pa. Super. Ct. 1981) ("The Statute of Frauds is satisfied by the existence of a written memorandum . . . sufficiently indicating the terms of the oral agreement . . . .").

Second, the staff interpretation is reasonable; it resolves the ambiguity between the plain text of Regulation Z and state law closer to the former, requiring more than a "memorandum . . . indicating the terms of the oral agreement," as would be required by the statute of frauds.[116]

Third, the "character and context" of the staff interpretation entitle it to deference. The 1977 staff interpretation requiring a formal writing was published in the Federal Register, and the staff reaffirmed its interpretation after Regulation Z was amended to require a "written agreement." The Consumer Financial Protection Bureau reissued that same interpretation without alteration. Thus, the staff interpretation constitutes the agencies' "official position."

---

[116] *Haines*, 433 A.2d at 33. Wolfington argues that the staff interpretation is unreasonable because it would allow a creditor "to exempt itself from TILA's consumer protections through the simple expedient of documenting the parties' credit arrangements through confirmatory emails rather than a formal written agreement." Appellant Letter Br. at 5. That argument is misplaced for two reasons. First, as discussed at length, the Board has required a formal writing since at least 1977, and there is no evidence that creditors have systematically sought to circumvent the Act's disclosure requirements by avoiding formal written agreements. Second, the reasonableness requirement of *Kisor* simply requires the agency's interpretation to fall within the regulation's "zone of ambiguity." 139 S. Ct. at 2416. The staff interpretation easily meets that requirement.

Fourth, the staff interpretation implicates the agencies' substantive expertise. Although Wolfington argues that the scope of a "written agreement" is an "interpretive issue[]" that "fall[s] more naturally into a judge's bailiwick,"[117] he ignores the relationship between the scope of a "written agreement" and the implementation of the Act and Regulation Z. That implementation is uniquely within the Board's province, as the scope of the "written agreement" requirement affects the efficient enforcement of the Act and the extent of creditors' disclosure duties. Indeed, the relevance of the agency's substantive expertise is particularly apparent in the fact that Congress has provided a defense for any "act done or omitted in good faith in conformity with any . . . interpretation" of Regulation Z promulgated by the Board[118]—including its interpretation of the "written agreement" requirement. Under that statutory scheme, the interpretation of the Act and Regulation Z are well within the Board's substantive expertise.

Finally, the staff interpretation reflects the agencies' "fair and considered judgment." [119] The requirement of a formal writing has been enforced by two different agencies for more than forty years and has been reaffirmed repeatedly both in staff interpretations and by the incorporation of the requirement in Regulation Z.

Thus, we conclude that the staff interpretation of a "written agreement" is entitled to deference from this Court.

---

[117] Appellant Letter Br. at 4 (quoting *Kisor*, 139 S. Ct. at 2419).
[118] 15 U.S.C. § 1640(f).
[119] *Kisor*, 139 S. Ct. at 2417 (quoting *Christopher*, 567 U.S. at 155).

Because Wolfington has not pled such an agreement, we will affirm the District Court's judgment on the pleadings.

## B.    Rule 11 Sanctions

Second, Wolfington's counsel challenges the District Court's *sua sponte* imposition of sanctions under Rule 11 in the form of attorneys' fees.  Rule 11 requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record."[120]  "By presenting to the court a pleading, written motion, or other paper," an attorney certifies "after an inquiry reasonable under the circumstances" that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law" and that "the factual contentions have evidentiary support."[121]

Although the imposition of sanctions previously focused on counsel's subjective good faith, "the test is now an objective one of reasonableness."[122]  The reasonableness of counsel's conduct depends on a number of factors, including, "the amount of time available to . . . conduct[] the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated" and "the complexity of the legal and

---

[120] Fed. R. Civ. P. 11(a).

[121] Fed. R. Civ. P. 11(b)(2)-(3).

[122] *Lieb v. Topstone Indus.*, 788 F.2d 151, 157 (3d Cir. 1986) (quoting *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir. 1985)).

33

factual issues implicated."[123]   A court may not *sua sponte* initiate proceedings under Rule 11 after "voluntary dismissal or settlement of the claims" at issue.[124]   The District Court's imposition of sanctions is reviewed for abuse of discretion.[125]

The District Court imposed sanctions on Wolfington's counsel for three reasons:  (1) failing to investigate and obtain Wolfington's bank records; (2) alleging that there was a "written agreement" between the parties and an "extension of credit"; and, (3) alleging that Wolfington could serve as an adequate class representative.[126]   Below, we analyze each of the District Court's grounds for imposing sanctions as well as whether a district court may *sua sponte* award attorneys' fees. Although Wolfington's counsel raises a number of arguments challenging the imposition of sanctions, we conclude that counsel's conduct did not run afoul of Rule 11 and therefore do not reach those other arguments.

### 1.    *Failure to Investigate Bank Records*

---

[123] *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988).

[124] Fed. R. Civ. P. 11(c)(5)(B).

[125] *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 289 (3d Cir. 1991).

[126] JA 59-64.  The District Court states that it initiated Rule 11 proceedings for a fourth reason, because "[s]everal of the allegations in the Complaint were false." JA 46.  However, the District Court does not discuss any false allegations as an independent reason to impose sanctions and appears to have integrated that reason with its other three.

The District Court's first reason for imposing sanctions—counsel's failure to investigate and obtain Wolfington's bank records—rested on the fact "that [Wolfington] made no payment to Rothman after his surgery on January 21, 2016."[127] According to the District Court, had counsel "taken the simple step of obtaining [Wolfington's] bank records . . . it would have been obvious that allegations that Rothman was deducting $100.00 a month from [Wolfington's] bank account beginning in February 21, 2016 were utterly false."[128]

Such payments, however, are irrelevant to a claim under the Truth in Lending Act. "'The Truth in Lending Act is a disclosure law . . . . It is the obligation to disclose, not the duty of subsequent performance, towards which the Act is directed.'"[129] The irrelevance of actual payments by the debtor is belied by the Act's structure. As noted above, a creditor is required to make the Act's mandated disclosures before the credit transaction is consummated—that is, when the borrower becomes "contractually obligated on a credit transaction."[130] The borrower's contractual obligation to make payments, however, does not arise until after the consummation of the credit transaction and, consequently, after the creditor is required to make the Act's mandated disclosures. Thus, a

---

[127] JA 60 (reasoning that the bank records would show that "Plaintiff made no payments to Rothman").

[128] JA 61.

[129] *Davis v. Werne*, 673 F.2d 866, 869 (5th Cir. 1982) (omission in original) (internal quotation marks omitted) (quoting *Burgess v. Charlottesville Savings & Loan Ass'n*, 477 F.2d 40, 44-45 (4th Cir. 1973)).

[130] 12 C.F.R. § 226.2(a)(13).

creditor's obligations under the Act precede a debtor's obligations under contract both temporally and logically.

In this case, Wolfington's alleged payments were relevant only to his withdrawn claim under the Electronic Funds Transfer Act.[131] That claim, however, could not serve as a basis for *sua sponte* sanctions under Rule 11, because it was withdrawn. Rule 11 provides, "The court must not impose a monetary sanction . . . on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal" of the claims at issue,[132] a provision that was added by amendments to the Rule in 1993.[133] Because that claim was withdrawn before the District Court ordered counsel to show cause, it consequently could not serve as grounds for the imposition of sanctions.

Despite the express language of Rule 11, the District Court stated that it did "not credit counsel's contention that [it] could not impose sanctions for the voluntarily dismissed EFTA claim."[134] The District Court cited two pre-amendment cases, *Cooter & Gell v. Hartmarx Corp.*[135] and *Schering Corp. v. Vitarine Pharm., Inc.*[136] for the proposition that it may impose sanctions on withdrawn claims. Neither of those decisions,

---

[131] JA 95. The factually incorrect allegations regarding Wolfington's payments appeared in the Complaint only under the heading "EFTA." JA 94.

[132] Fed. R. Civ. P. 11(c)(5)(B).

[133] Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

[134] JA 57 n.12.

[135] 496 U.S. 384, 398 (1990).

[136] 889 F.2d 490, 496 (3d Cir. 1989).

however, involved sanctions imposed *sua sponte*,[137] and to the extent they permit a court to *sua sponte* impose sanctions on claims that were withdrawn before any show cause order was issued, they were superseded by the 1993 amendments to Rule 11. Those amendments expressly provide that "a monetary sanction imposed after a court-initiated show cause order . . . be imposed only if the show cause order is issued before any voluntary dismissal."[138] Consequently, the District Court was incorrect that it *could* impose sanctions for Wolfington's withdrawn claim if it so determined.

### 2. Allegations of Extension of Credit and a Written Agreement

The District Court's second reason for imposing sanctions, because there was no "extension of credit" and no "written agreement," was also in error. In imposing sanctions, the District Court concluded that counsel unreasonably alleged the "extension of credit" because Wolfington failed to make payments to Rothman.[139] The District Court reasoned that without any payments, there was no consideration, and consequently, no extension of credit.[140] This is incorrect; under Pennsylvania law, the exchange of bargained-for

---

[137] 496 U.S. at 389; 889 F.2d at 494.

[138] Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

[139] JA 62.

[140] *Id*. Although the contractual obligations of the parties are most relevant to consummation of the credit transaction, we follow the District Court's analysis of consideration under the label of "extension of credit," without adopting or endorsing it. *See supra* note 106.

promises constitutes valid consideration.[141] Thus, the District Court erred in concluding that there was no extension of credit because Wolfington failed to make payments; instead, the extension of credit was valid upon the exchange of promises.

Further, the District Court erred in concluding that counsel unreasonably alleged the existence of a "written agreement." The reasonableness of the allegations in a complaint and counsel's underlying investigation depend, in part, on the "the complexity of the legal and factual issues implicated."[142] The Federal Reserve Board's interpretation of the "written agreement" requirement now in Regulation Z dates from 1977 and is buried in the annals of the Federal Register. Although those interpretations are entitled to deference, counsel's failure to find them was not unreasonable. Instead, counsel raised a reasonable argument, interpreting the text of Regulation Z to require only a "writing . . . to confirm what the oral agreement was," an interpretation the District Court acknowledged was plausible.[143] Thus, counsel's reliance on the January 20 email as a "written agreement" was not unreasonable, despite ultimately being incorrect.

### 3. Class Allegations

The District Court's third ground for imposing sanctions—counsel's class-related allegations—also rested on counsel's failure to obtain Wolfington's bank records. The District Court stated, "If the bank records had been secured, it would have been obvious that there was no basis whatsoever

---

[141] *See Greene*, 526 A.2d at 1195.
[142] *Mary Ann Pensiero*, 847 F.2d at 95.
[143] JA 202-03.

to allege Plaintiff could represent a class," presumably because he failed to make payments to Rothman.[144] This ground fails for the same reasons as the first: Wolfington's failure to make payments to Rothman is irrelevant to his Truth-in-Lending claim.

### 4. Sua Sponte *Award of Attorneys' Fees*

Finally, the District Court erred in imposing sanctions in the form of an award of attorneys' fees under Rule 11 *sua sponte*. Rule 11 does not permit a district court to award attorneys' fees in proceedings initiated under the Rule *sua sponte*. Rule 11(c)(4) defines the sanctions available to the sanctioning court. It provides, "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."[145] Unlike for the imposition of "nonmonetary" sanctions and "penalt[ies]" paid to the court, Rule 11(c)(4) allows an award of attorneys' fees only "if imposed on motion." That provision was added to Rule 11 as subsection (c)(2) by the Rule's 1993 amendments; the Advisory Committee's notes to the 1993 amendments confirm this reading of the Rule.[146] The 1993 notes provide, "The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order. . . . The revision provides that a monetary sanction

---

[144] JA 63-64.

[145] Fed. R. Civ. P. 11(c)(4).

[146] Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

imposed after a court-initiated show cause order be limited to a penalty payable to the court."[147] Thus, a court may not require payment of attorneys' fees in Rule 11 proceedings initiated *sua sponte*.[148]

For the above reasons, the District Court abused its discretion in imposing sanctions. Because the imposition of sanctions is necessarily fact-intensive and only Rule 11 was briefed by the parties in the District Court or addressed by the District Court, we decline to consider in the first instance whether sanctions could have been imposed on other grounds.

### C.    Leave to Amend

Finally, we consider Wolfington's belated request for leave to amend his Complaint. Motions to amend under Rule 15 are typically granted liberally, and a court may deny leave to amend only when "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."[149] However, "[w]hen a party seeks leave to amend a complaint after judgment has been entered, it must also move to set aside the judgment pursuant to Federal Rule of Civil Procedure 59(e) or 60(b), because the complaint

---

[147] *Id.*

[148] *Accord Hutchinson v. Pfeil*, 208 F.3d 1180, 1184 (10th Cir. 2000); *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 455 (5th Cir. 1998).

[149] *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016) (quoting *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014)).

cannot be amended while the judgment stands."[150] "Where a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors."[151] Nonetheless, "in non-civil rights cases, district courts have no obligation to offer leave to amend before dismissing a complaint unless the plaintiff properly requests it."[152]

Wolfington requests leave to amend in a footnote in a supplemental letter brief filed with this Court. However, on appeal, Wolfington fails to address whether he meets the standards for leave to amend under Rule 15(a). He likewise failed to move to amend his Complaint in the District Court. Consequently, we decline to consider those issues.

---

[150] *Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 367-68 (3d Cir. 2013) (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007)).
[151] *Cureton v. NCAA*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted); *Newark Branch, NAACP v. Harrison*, 907 F.2d 1408, 1417 (3d Cir. 1990) ("Accordingly, courts have held that grants for leave to amend complaints should be routinely granted to plaintiffs, even after judgments of dismissal have been entered against them, if the appropriate standard for leave to amend under Fed. R. Civ. P. 15(a) is satisfied."); *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984) (concluding that Rule 15(a) standard governs motion to amend after entry of judgment).
[152] *Jang*, 729 F.3d at 367 (citing *Fletcher-Harlee*, 482 F.3d at 252).

## IV.     Conclusion

For the foregoing reasons, we will affirm in part and reverse in part.