**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2112
_____

MID-AMERICAN SALT, LLC,
                                        Appellant

v.

MORRIS COUNTY COOPERATIVE PRICING COUNCIL;
CLINTON TOWNSHIP; FLEMINGTON BOROUGH;
FRANKLIN TOWNSHIP (SOMERSET COUNTY); GLEN
GARDNER BOROUGH; LEBANON TOWNSHIP;
RARITAN TOWNSHIP; READINGTON TOWNSHIP;
HUNTERDON COUNTY; CITY OF CLIFRON; HALEDON
BOROUGH; HAWTHORNE BOROUGH; LITTLE FALLS
TOWNSHIP; RINGWOOD BOROUGH; WAYNE
TOWNSHIP; WEST MILFORD TOWNSHIP; WEST
MILFORD BOARD OF EDUCATION; WOODLAND
PARK BOROUGH; PASSAIC COUNTY; BERNARDS
TOWNSHIP; BERNARDSVILLE BOROUGH;
HILLSBOROUGH TOWNSHIP; MONTGOMERY
TOWNSHIP; WATCHUNG BOROUGH; WARREN
TOWNSHIP, NJ; WARREN TOWNSHIP BOARD OF
EDUCATION; SOMERSET COUNTY; ANDOVER
TOWNSHIP; BRANCHVILLE BOROUGH; BYRAM
TOWNSHIP; FRANKFORD TOWNSHIP; GREEN
TOWNSHIP; HAMBURG BOROUGH; HAMPTON

TOWNSHIP; HOPATCONG BOROUGH; TOWN OF
NEWTON; SANDYSTON TOWNSHIP; SPARTA
TOWNSHIP; STANHOPE BOROUGH; VERNON
TOWNSHIP; WANTAGE TOWNSHIP; SUSSEX
COUNTY; HILLSIDE TOWNSHIP; NEW PROVIDENCE
BOROUGH; ROSELLE BOROUGH; CITY OF SUMMIT;
TOWN OF WESTFIELD; UNION COUNTY; FRANKLIN
TOWNSHIP (HUNTERDON COUNTY),

Appellees

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-17-cv-04262)
District Judge: Hon. Susan D. Wigenton

_____

Argued October 30, 2019

Before: HARDIMAN, PHIPPS, and NYGAARD,
*Circuit Judges*.

(Filed:  July 6, 2020)

Stephanie L. Hersperger [ARGUED]
Pion, Nerone, Girman, Winslow & Smith, P.C.
240 North 3rd Street
Payne Shoemaker Building, 10th Floor
Harrisburg, PA 17101

Frederick R. Damm
Scopelitis, Garvin, Light, Hanson & Feary, PLC
535 Griswold Street

2

Suite 1818
Detroit, MI 49266
     *Attorneys for Appellant Mid-American Salt, LLC*

Edward J. Buzak [ARGUED]
Susan L. Crawford
The Buzak Law Group, LLC
150 River Road, Suite N4
Montville, NJ 07045
     *Attorney for Appellee Morris County Cooperative Pricing Council*

Richard J. Guss
DiFrancesco Bateman Coley Yospin Kunzman Davis & Lehrer
15 Mountain Boulevard
Warren, NJ 07059
     *Attorney for Appellees Township of Raritan; Township of Bernards; Borough of Watchung & Township of Warren*

Andrew P. Oddo
425 Grant Avenue
Oradell, NJ 079649
     *Attorney for Appellee Borough of Haledon*

Jonathan Testa [ARGUED]
Dorsey & Semrau
714 Main Street
P.O. Box 228
Boonton, NJ 07005

Susan C. Sharpe
Dorsey & Semrau

714 Main Street
P.O. Box 228
Boonton, NJ 07005
    *Attorneys for Appellee Township of Little Falls;*
    *Township of West Milford; Township of Andover &*
    *Borough of Bloomingdale*

Jonathan Testa [ARGUED]
Dorsey & Semrau
714 Main Street
P.O. Box 228
Boonton, NJ 07005

Anthony P. Seijas
Cleary Giacobbe Alfieri & Jacobs
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ 07436
    *Attorneys for Appellee Township of Wayne*

Albert C. Buglione
Buglione Hutton & DeYoe
401 Hamburg Turnpike
Suite 206
Wayne, NJ 07474
    *Attorney for Appellee Borough of Woodland Park*

Robert B. McBriar
Schenck Price Smith & King
351 Sparta Avenue
Sparta, NJ 07871
    *Attorney for Appellee Borough of Hopatcong*

Ursula H. Leo

4

Laddey Clark & Ryan
60 Blue Heron Road
Suite 300
Sparta, NJ 07871
 *Attorney for Appellee Township of Sparta*

Donald A. Klein
Weiner Law Group
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054
 *Attorney for Appellee Township of Wantage*

Katharine A. Fina
Florio Perrucci Steinhardt & Cappelli
235 Broubalow Way
Phillipsburg, NJ 08865

Lester E. Taylor, III
Florio Perrucci Steinhardt & Fader
218 Route 17 North
Suite 410
Rochelle Park, NJ 07662
 *Attorneys for Appellee Borough of Roselle*

Louis N. Rainone
Brian P. Trelease
Rainone Coughlin Minchello
555 U.S. Highway One South
Suite 440
Iselin, NJ 08830
 *Attorney for Appellee Township of Franklin*

Andrew Gimigliano

Joshua A. Zielinski
O'Toole Scrivo Fernandez Weiner Van Lieu
14 Village Park Road
Cedar Grove, NJ 07921
    *Attorney for Appellee Township of Vernon*

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

This appeal involves a contract dispute arising under New Jersey law. Appellant Mid-American Salt, LLC contracted with the Morris County Cooperative Pricing Council to provide its members with bulk rock salt at negotiated prices. But several of the Council's members bought no salt from Mid-American and others bought salt from its competitors at lower prices. Finding itself sitting on a pile of unsold salt, Mid-American sued the Council and almost fifty of its members. The District Court denied Mid-American relief and this appeal followed.

I

The Council was established in 1974 under New Jersey law, *see* N.J. STAT. ANN. § 40A:11–10. It consists of over 200 New Jersey counties, municipalities, police departments, and school districts. The Council bids, awards, and executes contracts for products and services so its members can obtain volume discounts. At all times relevant to this appeal, the

6

Township of Randolph served as the lead agency that managed the Council's affairs.

Mid-American is an Indiana limited liability company that imports and sells bulk road salt. According to Mid-American's amended complaint, the Council asked its members to estimate their rock salt needs for the 2016-17 winter. Based on those estimates, the Council issued a comprehensive bid package in the summer of 2016, in accordance with New Jersey law, anticipating the need for some 115,000 tons of rock salt. *See, e.g.*, N.J. STAT. ANN. § 40A:11-11; N.J. ADMIN. CODE 5:34-7.9–7.12. Mid-American was awarded the contract the following month.

Mid-American agreed to supply bulk rock salt to the Council's members in accordance with the terms and prices set forth in the contract. The bid specifications incorporated in the contract state:

> **This is an Open-Ended contract, meaning all items are specified with an estimated quantity. There is no obligation to purchase that quantity during the contract period, and the actual quantity purchased by members of the [Council] may vary.**
>
> **All quantities may be more or less than estimated.** No minimum order requirements are allowed, unless stated otherwise elsewhere.

App. 280 (bold in original). All parties agree that the executed contract, including the bid package, provided only *estimated* quantities of rock salt that Council members would purchase.

As required by the contract, Mid-American applied for and obtained a performance bond in the amount of $9,301,625.43. Based on the typical one percent fee, the bond cost Mid-American $93,016. The bid specifications also required Mid-American to fulfill rock salt orders within three business days. And if Mid-American failed to fulfill any order within five business days, members could receive authorization to obtain the salt from another licensed dealer. Mid-American would then be obligated to pay any difference in cost directly to the Council member. The contract also required Mid-American to "have adequate facilities for handling, storing and delivering 'treated' rock salt." App. 284.

In reliance on the estimates provided by the Council, Mid-American prepared to fulfill its contract obligations. It "imported salt from its exclusive salt mine in Mohammedia, Morocco," in three separate shiploads at a total cost of $4,800,000. App. 233–34. Mid-American then contracted with DuraPort Marine and Rail Terminal in Bayonne, New Jersey, to stage the salt for delivery to Council members. Mid-American paid $31,250 per month to store the salt and another $58,962.26 to cover it with tarps. Finally, Mid-American incurred at least another $220,000 in finance costs as well as "additional costs to rent barges and arrange for tugs, and to contract for trucks to deliver salt to [Council] members' barns." App. 234.

During the 2016–17 winter season, Council Defendants purchased only 5,565.39 tons of rock salt, representing less than five percent of the estimated tonnage. Mid-American also

8

claims "several" Council members "purchased salt from Mid-American's competitors," who lowered their prices after Mid-American had been awarded the contract. App. 236. For example, one of Mid-American's competitors (Atlantic Salt, Inc.) "reduced its price from $68.00/ton to $57.25/ton in order to under-bid [Mid-American's successful] bid of $64.34/ton." *Id.*

II

In June 2017, Mid-American sued the Council and forty-nine of its members in the United States District Court for the District of New Jersey. That same month, Mid-American filed an amended complaint alleging three counts against all Defendants: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) bad faith under Article 2 of the Uniform Commercial Code, N.J. STAT. ANN. § 12A:2-101, et seq.

Four sets of responses relevant to this appeal followed. First, the Council moved to dismiss, claiming it was not a proper party because it never had any obligation to purchase salt. Second, the Townships of Clinton, Montgomery, and Readington (collectively, Townships) jointly filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. About twenty other townships, boroughs, and cities joined the Townships' motion. Third, Wantage Township and the Township of Franklin (Somerset County) each filed a motion for judgment on the pleadings under Federal Rule of

Civil Procedure 12(c). Finally, seven additional townships and boroughs filed Rule 12(c) motions.[1]

In February 2018, the District Court granted the Council's and the Townships' motions to dismiss and the motions for judgment on the pleadings filed by Wantage and Franklin. The District Court found that Mid-American's claims failed as a matter of law because the company had no valid requirements contract with the Council or its members. Mid-American then filed a motion for reconsideration that included a request for leave to amend its complaint again to add a new claim for promissory estoppel.

In April 2018, the District Court denied Mid-American's motion for reconsideration and granted the motions for judgments on the pleadings filed by the seven Council members who had not joined in the original motions. Mid-American filed a timely notice of appeal from both orders.

III

The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because Mid-American is a citizen of Indiana, all Defendants are citizens of New Jersey, and the

---

[1] Some twenty Defendants settled with Mid-American before the District Court granted the various motions. Clinton, Montgomery, and Readington Townships likewise eventually settled, but the townships and boroughs who joined their motion to dismiss did not.

amount in controversy exceeds $75,000.00. We have jurisdiction under 28 U.S.C. § 1291.

IV

A threshold issue we must decide is whether the Council is a proper party to Mid-American's appeal. The Council filed a motion to dismiss because it was not named in the notice of appeal. We agree with the Council that it is not a party because Mid-American failed to appeal a final judgment involving the Council and evinced no intention to do so.

A

The Council argues Mid-American "neither appealed nor intended to appeal a district court order as to [it]." Council Br. 21. Mid-American claims it intended to appeal as to the Council all along.

Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure provides that a notice of appeal must "designate the judgment, order, or part thereof being appealed." "[A]n appeal from a final judgment that is identified in the notice will draw into question all non-final orders and rulings which produced the judgment." *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 144 (3d Cir. 1998) (citation omitted).

We construe notices of appeal liberally because "decisions on the merits are not to be avoided on grounds of technical violations of procedural rules." *Id.* "[L]iberal construction does not, however, excuse noncompliance with [Rule 3] . . . . [N]oncompliance is fatal to an appeal." *Smith v. Barry*, 502 U.S. 244, 248 (1992). And the subjective intent of the parties is irrelevant because "the notice afforded by a

11

document, not the litigant's motivation in filing it, determines the document's sufficiency as a notice of appeal." *Id.*

In determining whether an unspecified order is properly part of an appeal, we are governed by *Polonski*. That case instructs us to

> exercise appellate jurisdiction over orders that are not specified in the notice of appeal where: (1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues.

137 F.3d at 144.

The first and third *Polonski* requirements are satisfied here. One of the April 2018 orders specified in the notice of appeal bears a connection to the unspecified February 2018 order Mid-American asks us to review as to the Council. And the opposing party (the Council) suffered no prejudice because it had a full opportunity to brief the issues. Three weeks after noticing the appeal, Mid-American identified the Council as a party to this appeal in its Civil Appeal Information Statement and Concise Summary of the Case. So the Council has not been prejudiced by the delay. The only debatable question is whether the Council was constructively made a party to this appeal in the first place through Mid-American's "apparent intent." We hold it was not.

Mid-American made clear its intention *not* to appeal the unspecified order. Mid-American specifically asked the District Court not to reconsider its order granting the Council's

12

motion to dismiss. In a footnote to the opening paragraph of its brief filed with its motion for reconsideration, Mid-American stated it was "not seeking reconsideration of the Court's grant of the separate motion to dismiss filed by the [Council]." App. 476. Although Mid-American remained free to appeal from the final judgment of the District Court, it chose instead to appeal only the two April 2018 orders. In so doing, Mid-American explicitly named all 24 defendants implicated by those two orders. Tellingly, the Council is not among the named parties.

Mid-American now claims it intended to appeal the earlier order as to the Council all along. But the record indicates otherwise, suggesting a conscious decision by Mid-American not to appeal the motion to dismiss as to the Council. No indication of Mid-American's hidden intention surfaces between the April 2018 orders and the June 2018 filing of the Civil Appeal Information Statement and the Concise Summary of the Case. By that point, the deadline for filing a timely appeal had already passed. So we hold the Council is not a proper party to this appeal.

V

Turning to the merits, the first issue we must decide is whether, under New Jersey law, a valid requirements contract existed between Mid-American and the Council members. The District Court found such a contract did not exist and we agree. Because the contract lacked a binding promise from the

Council or its members to purchase all the salt they required, it was illusory.

A

We review de novo the District Court's orders granting motions to dismiss and motions for judgment on the pleadings. *Vallies v. Sky Bank*, 432 F.3d 493, 494 (3d Cir. 2006); *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988). "A motion to dismiss pursuant to Federal Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom there is no reasonable reading upon which the plaintiff may be entitled to relief." *Vallies*, 432 F.3d at 494 (internal quotation marks and citation omitted). And "[u]nder Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski*, 863 F.2d at 290 (internal quotation marks and citation omitted). As with a motion to dismiss, we view the facts presented and draw inferences therefrom in the light most favorable to the nonmoving party. *Id.* at 290–91.

B

"To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013). And "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or

14

construction and we must enforce those terms as written." *Kutzin v. Pirnie*, 591 A.2d 932, 936 (N.J. 1991).

At issue in this case is a "requirements contract." Under New Jersey law, such a contract measures quantity through "the requirements of the buyer," instead of through a fixed number stated in the contract. N.J. STAT. ANN. § 12A:2-306(1). Requirements contracts do not need a minimum or maximum order set forth therein, but instead rely on "such actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be tendered or demanded." *Id.* The official comment to this section further explains:

> If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

N.J. STAT. ANN. § 12A:2-306, Comment 3.

"[A]s a general rule, [] if it is wholly optional with one party to a bilateral agreement whether he shall perform or not, there is no legal contract. The promise of that party in such a bargain is illusory." *G. Loewus & Co. v. Vischia*, 65 A.2d 604, 606 (N.J. 1949). In *Loewus*, the New Jersey Supreme Court considered the validity of a requirements contract for domestic wine, instructing that

15

[i]n passing upon the validity of contracts of this character the general rule is that it will be presumed that the parties thereto intended to make a binding and enforceable obligation. As between two equally reasonable constructions, we should adopt the one which makes the contract valid, as against that reaching a contrary result.

*Id.* at 605–06 (citations omitted). Importantly, the contract at issue in *Loewus* included multiple provisions contemplating requirements and stated that "Vischia agrees to maintain at all times adequate equipment, staff and force of employees to meet the requirements of Loewus." *Id.* at 605. Despite these promises, none of which is present in this case, the New Jersey Supreme Court found no valid requirements contract existed, largely because the buyer had agreed to purchase wine only at "its future election." *Id.* at 606.

Mid-American relies heavily on an intermediate appellate case in New Jersey that involved a cooperative pricing agreement for asphalt paving materials signed by the Council. *See Tilcon New York, Inc. v. MCCPC*, 2014 WL 839122 (N.J. Super. Ct. App. Div. 2014). There, the Council and fifteen of its members were alleged to have purchased too much asphalt relative to their pre-bid estimates because of a spike in market price for asphalt cement. The asphalt contractors sued, seeking retroactive price increases for the over-bid sales. *Id.* at *1. Council members responded that they were "not obliged to purchase asphalt" under the contract, essentially rendering the contract illusory. *Id.* at *26. Although the court ultimately ruled for the Council members, it found that a valid requirements contract existed. *Id.* In so doing, the court interpreted Section 5:34-7:11(d) of the New Jersey

16

Administrative Code as requiring Council members who submitted pre-bid estimates to purchase asphalt consistent with the specifications of the contract. *Id.* at *26 n.22. The pertinent code section reads, in relevant part: "Registered members who submit estimates shall not issue orders and contractors shall not make deliveries, that deviate from the specifications or price as set forth in the master contract." N.J. ADMIN. CODE § 5:34-7.11(d).

The Council responds to *Tilcon* with a contrary administrative law decision. *See Bd. of Educ. of the Twp. of Sparta, Sussex County v. Bd. of Educ. of the Twp. of Byram, Sussex County*, 2011 WL 1843970, at *14 (N.J. Admin. 2011). In that case, a New Jersey Administrative Law Judge opined that cooperative pricing councils allow the lead agency to "essentially [provide] the members of the cooperative pricing system the availability of prices for specified items based upon its having carried out the advertising and bid procedures required by the Local Public Contracts Law." The ALJ noted that, as a member of the Council, "Sparta was not required to purchase a specific quantity or all of its fuel oil needs from Finch Fuel, but had the option to purchase as little or as much fuel oil as it wanted." *Sparta*, 2011 WL 1843970, at *3. Because *Sparta* and *Tilcon* cannot be reconciled and they include some dissimilar facts to this appeal, New Jersey caselaw does not answer the question presented.

The Council members argue they entered into a valid, binding contract with Mid-American. Under the contract terms, Mid-American was required to provide bulk road salt to the members as needed. Yet the Council members claim no corresponding requirement existed for any of them to purchase a single pound of salt from Mid-American. In their view, the agreement is essentially an options contract.

17

Mid-American counters that the contract must be read to require Council members who submitted estimates to purchase all their salt needs from Mid-American. On this reading, the contract's final quantity-variation provision relieves a member with no salt needs of any obligation to purchase. But that does not mean, Mid-American says, that members remain free to purchase salt from Mid-American's competitors at discounted prices.

Neither the general terms of the contract nor the specific provision Mid-American relies on support its position. Found in bold in the bid specifications, the quantity-variation provision reads: "**There is no obligation to purchase that quantity** [referring to the estimates] **during the contract period, and the actual quantity purchased by members of the [Council] may vary.**" App. 280. Citing the explicit statement "that defendants had 'no obligation to purchase' during the contract period," the District Court observed that "[Mid-American's] own pleadings and the unambiguous language of the contract" contradicted Mid-American's contention that there was an implicit promise to purchase certain amounts of salt. App. 10. We agree.

Mid-American reminds us that when faced with "two equally reasonable constructions" of a contract, New Jersey law requires us to adopt the construction that renders the contract valid. *Loewus*, 65 A.2d at 606. But we do not face two such constructions here because Mid-American's construction of the contract is not "equally reasonable" to the Council's. Unlike the contract at issue in *Loewus*, this contract does not clearly state that it is for "requirements." Nor does it mention the word "exclusive," which is another hallmark of a requirements contract. *See* N.J. STAT. ANN. § 12A:2-306. The absence of these fundamental attributes of a requirements

18

contract, when combined with the Council members' promise to buy salt in such quantities "as may be desired" or as they "may want," compels us to hold that the contract is illusory. *See Loewus*, 65 A.2d at 606.

The dissent urges us to hold that under New Jersey law "a promise to *pay for* estimated quantities of required materials is enforceable." Dis. Op. at 1 (emphasis added). We do not contest this formulation of New Jersey law. But we disagree with the dissent's repeated assertions that "[C]ouncil members promised to pay for quantities required" in this case. Dis. Op. at 2. Neither the Council nor its members made such a promise anywhere in the contract.

In concluding that an enforceable promise exists here, the dissent relies on the estimated quantities incorporated into the bid proposal along with two paragraphs in "Contract #3: Rock Salt & Liquid Calcium Chloride." Dis. Op. at 8–10; *see* App. 407–08.  It cites Paragraph 5 of Contract #3 to support its conclusion that "[C]ouncil members agreed to pay for the rock salt provided by Mid-American." Dis. Op. at 9. But this paragraph does not contain a promise to purchase requirements. In full it states:

> Members of the MCCPC agree to pay Contractor for said work and/or materials when completed or delivered, as the case may be, in accordance with the said specifications and Contractor's proposal and within the time stated for the actual quantity of authorized work done under each item scheduled by the proposal, *or* for quantities required, at the respective unit prices bid therefore by the Contractor.

19

App. 408 (Contract #3 ¶ 5) (emphasis added). This paragraph contemplates payment based *either* on the "actual quantity of authorized work done" *or* for "quantities required." *Id.* In this case, Council members placed few orders for rock salt and they paid according to the "actual quantity" of salt purchased. The language of this paragraph expressly allows for such a scenario through the use of the disjunctive "or." It likewise bears repeating that the referenced bid specifications and proposal nowhere state that a requirements contract is being formed.

The dissent's argument that the use of "or" in Paragraph 5 is not "fatal to enforceability," Dis. Op. at 12, is beside the point. In urging us to interpret that Paragraph as providing options for calculating payment amount, the dissent essentially claims that since a requirements contract *already exists* here, the payment amount is calculated based on the "quantities required" provision. *Id.* ("But if the contract is for requirements, then the payment amount will be determined by 'unit bid prices.'") (citation omitted). This interpretation is inconsistent with the dissent's own reliance on this very same paragraph to *establish* that a requirements contract exists in the first place. *See* Dis. Op. at 9–10 (citing Paragraph 5).[2]

---

[2] The only other reference to requirements is Paragraph 3 of Contract #3, which discusses *Mid-American's* obligations under the contract—not the Council members. *See* App. 407 (Contract #3 ¶ 3) ("The contractor will furnish said material required as stated in the bid proposal at anytime during the term of the Contract . . . ."). This provision did not create a requirements contract for two reasons. First, the referenced bid

Finally, we note these are sophisticated parties capable of entering into precisely the kind of contract they desire. It would have been easy to, for example, insert a simple provision stating, "This is a contract for rock salt requirements and the Council covenants to purchase (and pay for) its rock salt requirements from the Contractor." Even merely titling this a "Requirements Contract" would have indicated to us that a requirements contract was, in fact, being formed. But that is not the contract we have before us and we will not rewrite the bargain for the parties.

In sum, neither the Council nor its members ever promised to purchase from Mid-American all the rock salt they required. And their promise to pay for any rock salt they might have purchased—a rather obvious proposition—does not oblige them to actually purchase anything. Nor can the implied covenant of good faith and fair dealing, *see* Dis. Op. at 5 (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575 (N.J. 1997)), supply a promise that was never made. Because Mid-American promised to supply rock salt requirements to the Council and its members without obtaining a corresponding promise in return, we hold that the contract is illusory.

---

proposal does not contain a promise to purchase requirements and expressly disclaims any intention to bind Council members to estimates "as stated in the bid proposal." *Id.* Second, we agree that the contract obligated Mid-American to provide rock salt at the Council members' request. But the lack of a corresponding promise *by the Council or its members* to purchase its rock salt requirements from Mid-American is what makes the contract illusory.

## VI

Finally, we must decide whether the District Court properly denied Mid-American's motion for reconsideration. In that motion, Mid-American also requested leave to amend its complaint to include a promissory estoppel claim.

### A

We review the District Court's order denying a motion for reconsideration for abuse of discretion. *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1203 (3d Cir. 1995). The same standard applies to our review of the order denying Mid-American's motion to amend its complaint. *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000).

### B

In denying the motion for reconsideration, the District Court also denied Mid-American's request for leave to amend its complaint. Mid-American had requested leave to include a claim for promissory estoppel. It admits that it "arguably should have filed a separate motion to amend," but nonetheless claims its request was improperly denied. Mid-American Br. 55 n.14.

Motions for reconsideration exist to "correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). Amendments to pre-trial pleadings that do not qualify for amendment as a matter of course are governed by Rule 15(a)(2) of the Federal Rules of Civil Procedure. These amendments require leave from the court, which "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). "[A] district

court must permit a curative amendment unless such an amendment would be inequitable or futile," particularly where "a complaint is vulnerable to 12(b)(6) dismissal." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236, 245 (3d Cir. 2008) (citation omitted).

In its denial of leave to amend, the District Court noted that "[r]econsideration motions . . . may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment." App. 16 (citing *NL Indus., Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996)). It concluded that as a "sophisticated business entity with competent counsel," Mid-American chose not to raise a claim for promissory estoppel in its complaint. *Id.* Mid-American was thus precluded from using its later motion for reconsideration to advance that claim. *Id.*

The District Court was correct to conclude that a motion for reconsideration was the improper vehicle for Mid-American's request for leave to amend. Mid-American had ample opportunity to request leave to assert a claim for promissory estoppel prior to the entry of judgment, but decided not to. It was precluded from later seeking to advance that claim through a motion for reconsideration after a final judgment. *See Wolfington v. Reconstructive Orthopaedic Assoc. II PC*, 935 F.3d 187, 210 (3d Cir. 2019) (holding that seeking leave to amend a complaint after judgment would require also moving to set aside the judgment under Rules 59(e) or 60).

Even had Mid-American properly requested leave to assert a claim for promissory estoppel, such a claim would have been futile. We have held the contract illusory, so the Council members never made a "clear and definite promise" to

23

purchase any salt from Mid-American. *Toll Bros., Inc. v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 944 A.2d 1, 19 (N.J. 2008) (citation omitted). The District Court did not err when it denied Mid-American leave to amend its complaint.

*         *         *

In sum, no valid requirements contract for bulk rock salt existed here because the contract was illusory. And because Mid-American's proposed new cause of action was procedurally improper and futile in any event, the District Court did not abuse its discretion in denying Mid-American's motion for reconsideration. We will affirm the orders of the District Court.

24

PHIPPS, *Circuit Judge*, dissenting.

This case hinges on a question of state substantive law: whether a promise to *pay for* estimated quantities of required materials is enforceable. In interpreting New Jersey law,[1] the Majority Opinion holds that such a promise does not suffice to form a requirements contract. Instead, the Majority Opinion conditions the enforceability of a requirements contract on an express promise to *purchase* – not merely to *pay for* – requirements. I disagree and believe that when a promise to pay for requirements is accompanied by estimated quantities of required materials, New Jersey law recognizes the formation of a binding requirements contract.

Here, several New Jersey counties and municipalities, as members of a cooperative pricing council, solicited bids to supply their annual rock salt needs, and they provided estimates of their annual rock salt requirements. Mid-American Salt LLC submitted a bid, and the council awarded a contract to Mid-American. Through that contract, which incorporated the council members' estimates of their rock salt

---

[1] As a case filed in New Jersey federal court premised on diversity jurisdiction, New Jersey's choice-of-law rules determine governing substantive law. *See Liggon-Reading v. Estate of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)); *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008). Under those rules, parties to a contract may specify the substantive law that will govern their agreement. *See Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183-84 (3d Cir. 2017). And here, the parties agreed to "be governed by the laws of the State of New Jersey." General Conditions and Instruction to Bidders (JA306).

requirements, Mid-American promised to furnish the council members with their rock salt requirements, and the council members promised to pay for quantities required.

The Majority Opinion views the council members' promise to pay for rock salt as imposing no obligation on them to purchase their required rock salt from Mid-American. But as I see it, the council members' good faith estimates of their rock salt needs, coupled with their promise to pay for quantities required, obligated them to purchase rock salt from Mid-American in quantities reasonably proportionate to the estimates. Because the council members did not do so, I would reverse the District Court's judgment dismissing Mid-American's three-count complaint against the council and its members.

## I.  Under New Jersey Law, a Promise to Pay for Estimated Quantities of Required Materials Is Enforceable.

Not all promises are enforceable. *See* E. Allan Farnsworth, Contracts 12 (2d ed. 1990) ("No legal system has even been reckless enough to make all promises enforceable."). For a promise to be enforceable, there must be consideration. *See Martindale v. Sandvik, Inc.*, 800 A.2d 872, 878 (N.J. 2002) ("Basic contract principles render a promise enforceable against the promisor if the promisee gave some consideration for the promise.").[2]  In relying on the

---

[2] *See also Shebar v. Sanyo Business Sys. Corp.*, 544 A.2d 377, 383 (N.J. 1988) (describing consideration as an "essential requirement" of a contract); *Kilborn v. Pyne*, 279 F. 864, 866

Restatement (Second) of Contracts, the New Jersey Supreme Court has defined consideration as having a procedural component (bargaining) and a substantive component (an act, forbearance, or other alteration of a legal relationship):

> The essential requirement of consideration is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation. If the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of obligation.

*Shebar*, 544 A.2d at 383 (citations omitted); *see also Martindale*, 800 A.2d at 878; Restatement (Second) of Contracts § 71 (October 2019 update).

The adequacy of consideration poses a question of some depth in the context of a requirements contract. Such a contract traditionally involves a promise to purchase all specified goods or services required for a certain period at a certain price.[3]

---

(3d Cir. 1922) ("A promise without consideration is not enforceable.").

[3] *See generally* Black's Law Dictionary 1468 (4th ed. 1968) (defining a "requirement contract" as "a contract in writing in whereby one agrees to buy, for a sufficient consideration, all of the merchandise of a designated type which the buyer may require for use in his own established business").

3

Although such contracts are unquestionably bargained for, the issue is whether that promise is substantive or illusory.[4]  As this Circuit once observed about requirements contracts, albeit in the context of Pennsylvania law, without a duty of good faith, the buyer's promise is generally illusory because "the buyer in a requirements contract has no duty to have any requirements." *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471, 473 (3d Cir. 1942).

At common law, New Jersey was similarly hesitant to recognize the enforceability of requirements contracts due to concerns about the absence of adequate consideration.  Most notably, the New Jersey Supreme Court in *G. Loewus & Co. v. Vischia*, 65 A.2d 604 (N.J. 1949), held that a requirements contract that lacked "a reasonably accurate estimate" of the supplies needed was not enforceable.  *Id*. at 606.  There, a wine distributor agreed with a winery "to place orders . . . from time to time for such wine as it may *require* under labels bearing brand or trade names which are its exclusive property." *Id.* at 604-05 (emphasis added).  Without an estimated-quantity provision, the New Jersey Supreme Court held that the winery's promise to place orders for required quantities did not constitute adequate consideration because it was "left to depend for its very existence upon its future election." *Id*. at 606.

---

[4] *See generally* 2 Corbin on Contracts § 5.28 ("If what appears to be a promise is an illusion, there is no promise . . . Such an illusory promise is neither enforceable against the one making it, nor is it operative as a consideration for a return promise. Thus, if there is no other consideration for a return promise, the result is that no contract is created.").

Subsequently, in 1961, New Jersey adopted a modified version of the Uniform Commercial Code, which refined the consideration needed for requirements contracts. *See* N.J. Stat. Ann. § 12A:2-306(1). Under the now-governing statutory provision, the enforceability of a requirements contract rests on a duty of good faith:

> A term which measures the quantity by … the requirements of the buyer means such actual . . . requirements *as may occur in good faith*, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior … requirements may be tendered or demanded.

*Id.* (emphasis added); *see also id.* § 12A:1-201(b)(20) (defining "good faith" generally as meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing"); *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) ("[E]very contract in New Jersey contains an implied covenant of good faith and faith dealing.").

Under that formulation, the duty of good faith acts as a ballast to steady an otherwise uncertain promise so that a requirements contract does not lack adequate consideration.[5]

---

[5] *See* 2 Corbin on Contracts § 6.5 ("Under a requirements contract, the buyer retains a great deal of discretion as to the quantity ordered but the discretion must be exercised in good faith. The obligation of good faith is a limit on the buyer's freedom of action and prevents the promise to buy from being illusory.").

5

As explained by the official statutory comments, which carry persuasive force under New Jersey law,[6] a requirements contract is enforceable because "the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his . . . requirements will approximate a reasonably foreseeable figure." *See* N.J. Stat. Ann. § 12A:2-306 cmt. 2. Thus, due to the implicit duty of good faith, requirements contracts are enforceable in New Jersey.

But nothing about New Jersey's statutory formulation suggests that the identification of estimated quantities of required materials has gone from the missing ingredient for adequate consideration, *see G. Loewus*, 65 A.2d at 606, to illusions. To the contrary, estimated quantities of required materials enhance the adequacy of consideration consistent with the duty of good faith because those estimates serve as benchmarks for assessing breach: "the agreed estimate is to be regarded as a center around which the parties intend the variation to occur." N.J. Stat. Ann. § 12A: 2-306 cmt. 3; *see generally* Melvin Aron Eisenberg, *The Principles of Consideration*, 67 Cornell L. Rev. 640, 640 (1982) (positing that "theories of enforceability must focus heavily on appropriate measures of damages").

Although sparse, subsequent New Jersey judicial and administrative decisions do not diminish the significance of estimated quantities in requirements contracts. The most recent and on-point case, an unreported decision from the

---

[6] *See, e.g.*, *Ramirez v. Autosport*, 440 A.2d 1345, 1349 (N.J. 1982).

Appellate Division of the New Jersey Superior Court, held that a requirements contract containing estimated quantities was enforceable. *See Tilcon N.Y., Inc. v. Morris Cty. Coop. Pricing Council*, 2014 WL 839122 (N.J. Super. Ct. App. Div. Mar. 5, 2014). In construing that contract for estimated quantities of asphalt, that decision held that "implicit in [the] submission of estimates was a promise to purchase amounts approximately equal to those estimates." *Id.* at *27.

Even decisions finding promises unenforceable do not negate the importance of estimated quantities. In one case, the parties agreed to price terms for the delivery of concrete for a specific construction project. *See Loizeaux Builders Supply Co. v. Donald B. Ludwig Co.*, 366 A.2d 721, 723 (N.J. Super. Ct. Law Div. 1976). But the purchaser did not identify estimated quantities of concrete. *See id.* at 723-24. Nor did the purchaser promise to buy the concrete required for the job. *See id.* at 723. In holding that such an arrangement was not a binding contract, the Superior Court did not touch upon, much less disturb, the principle that estimated quantities add dimension to otherwise uncertain promises for requirements.

The unreported administrative ruling cited by the Majority Opinion does not call into doubt that principle. *See Bd. of Educ. of the Twp. of Sparta, Sussex, Cty., v. Bd. of Educ. of the Twp. of Byram, Sussex Cty.*, 2011 WL 1843970 (N.J. Admin. May 13, 2011). That decision refused to enforce a joint purchasing agreement between school districts for fuel oil. *Id.* at *3, 20. But the primary reasons for that outcome had nothing to do with estimated quantities of required fuel oil. *See id.* at *18. Rather, the contract was unenforceable because the lead contracting agency "failed to create and register a cooperative purchasing system," and that agency "did not prepare and enter into a written joint purchasing agreement . . . in accordance

7

with the statutory and regulatory requirements." *Id.* As a tertiary rationale, the administrative ruling relied on the correspondence between the parties that did not identify required quantities of fuel oil but instead listed only the "size and number of [the] fuel oil tanks." *Id.* at *19. The identification of nothing more than storage capacity differs significantly from a specific estimate of annual quantities of required materials.

From these authorities, I interpret New Jersey law as allowing parties to form an enforceable requirements contract through an identification of estimated quantities of required materials, together with promises to furnish and pay for requirements.

## II. The Council Members' Promise to Pay for Estimated Quantities of Required Rock Salt Is Enforceable.

The members of the cooperative pricing council entered a binding contract for their rock salt requirements. As part of their bid specifications, the council members provided estimated quantities of "Bulk Rock Salt, Delivered by Truck, Unloaded by Bidder." Bid Specifications at 3, 9-13 (JA282, 288-92); *see also* Notification of Award at 2 (JA414).[7] For

---

[7] *See* N.J. Admin Code § 5:34-7.2 (defining a "cooperative pricing system" as "a purchasing system in which a local contracting unit advertises for bids and awards a master contract to a successful vendor for its own quantities and the *estimated quantities* submitted by the individual registered members" (emphasis added)); *see generally* N.J. Stat. Ann. § 40A:11-11(5) (providing for cooperative pricing systems).

8

purposes of awarding the contract on a county-by-county basis, those estimated quantities were aggregated into bid proposals at the county level, to achieve lower prices through a volume discount.[8]  From those estimates, Mid-American submitted a qualifying bid, and the council awarded it a contract to deliver bulk rock salt to council members within five counties.  The contract memorialized Mid-American's promises to furnish the *required* materials as estimated by the council members' bid proposals:

> [Mid-American] will furnish said material ***required*** as stated in the bid proposal at anytime during the term of the Contract.

Contract #3: Rock Salt & Liquid Calcium Chloride ¶ 3 (JA407) (emphasis added).  In return, the council members agreed to pay for the rock salt provided by Mid-American in fulfillment of those requirements:

> [Council members] agree to pay [Mid-American] for said work and/or materials when completed or delivered, as the case may be . . .

---

[8] *See Tilcon*, 2014 WL 839122, at \*27 ("The underlying goal of the statute authorizing cooperative pricing systems is to enable local governments to obtain favorable prices by pooling their purchasing power and securing prices that reflect quantity discounts and sellers' economies of scale.  Potential bidders would be less likely to offer quantity-based discounts if members could submit estimates, but avoid the contract price of goods entirely if market prices fell, and enforce the contract price if market prices rose.").

for *quantities required*, at the respective unit prices bid therefore by [Mid-American].

*Id.* ¶ 5 (JA 408) (emphasis added).

But after that award, council members in those counties bought either no rock salt from Mid-American or amounts dramatically less than the quantities estimated. Collectively, the council members in those counties purchased less than 5% of the estimated combined total of bulk rock salt from Mid-American.

On these allegations, Mid-American's complaint should not have been dismissed. Mid-American plausibly alleges adequate consideration – a bargained-for exchange of enforceable promises. The parties bargained for the rock salt contract through a formal process. The council members published a bid package, which included a notice to bidders, an invitation to bid, bid specifications, and bid proposals containing estimated quantities of rock salt. Mid-American submitted a bid, and the council issued a formal notice of award to Mid-American. Then Mid-American and the council signed a contract for rock salt. That contract incorporated the council members' estimates and contained Mid-American's promise to furnish the council members' rock salt requirements, which they would request through purchase orders. Finally, and most relevant here, the contract included the council members' promise to pay for the rock salt they received from Mid-American. In this context, in which council members submitted estimated quantities of their annual rock salt needs and Mid-American promised to meet those needs, the council members' promise to pay for the rock salt furnished by Mid-American should be enforceable.

Thus, unlike the Majority Opinion, I understand the parties to have formed a binding requirements contract. That agreement obligated council members, consistent with the duty of good faith, to purchase quantities of rock salt reasonably proportionate to their estimates. Because they did not, Mid-American should have been permitted to proceed with its three-count complaint and pursue, among other things, damages for purchase amounts that were "unreasonably disproportionate" to the council members' estimates. N.J. Stat. Ann. § 12A: 2-306(1).

## III. No Other Provisions of the Contract Render It Unenforceable.

In reaching a different conclusion, the Majority Opinion relies primarily on the absence of express promise by the council members to *purchase* their required rock salt from Mid-American. Maj. Op. at 19. The Majority Opinion also relies on two components of the council members' bid specifications: the no-minimum-order clause and the quantity-variation provisions. I see it differently.

### A. The Promise to Pay for Requirements, When Accompanied by Estimated Quantities, Is Enforceable.

The Majority Opinion refuses to enforce this contract because it "does not contain a promise to purchase requirements." Maj. Op. at 19. That is the nub of our disagreement. The Majority Opinion insists that a requirements contract must contain an express promise to *purchase* requirements. But as I understand New Jersey law, due to the centrality of the duty of good faith, a promise to *pay for* requirements becomes enforceable when it is accompanied

11

by estimated quantities of required materials. *See G. Loewus*, 65 A.2d at 606; *Tilcon*, 2014 WL 839122, at *27. Both a promise to pay for requirements and an identification of estimated quantities are present here. *See* Contract #3: Rock Salt & Liquid Calcium Chloride ¶¶ 3, 5 (JA407-08). And because that promise resulted from a bargaining process in which Mid-American promised to furnish requirements, I believe that the parties entered an enforceable requirements contract.

Nor is the disjunctive 'or' in the pay-for clause fatal to enforceability. *Cf.* Maj. Op. at 20. The options in that clause relate to different methods for calculating payment *amount*. If the contract specifies the quantity supplied, then the payment amount will be "in accordance with the said specification and the Contractor's proposal." Contract #3: Rock Salt & Liquid Calcium Chloride ¶ 5 (JA408). But if the contract is for requirements, then the payment amount will be determined by "unit bid prices." *Id.* Tellingly, the contract with Mid-American uses exclusively unit pricing – in further confirmation that it is a requirements contract. *See* Notice of Award at 2 (JA414) (specifying unit prices for Category I Bulk Rock Salt). But especially under New Jersey's presumption in favor of contract formation,[9] any perceived ambiguity in this

---

[9] *See Silverstein v. Keane*, 115 A.2d 1, 6 (N.J. 1955) ("The general rule of construction of contracts pertinent to [questions involving mutuality of obligation] is that it will be presumed that the parties thereto intended to make a binding and enforceable obligation and as between two equally reasonable constructions the court should adopt the one which makes the contract valid as opposed to one reaching a contrary result." (citing *G. Loweus*, 65 A.2d at 604)); *see also*

12

clause should not obliterate the enforceability of this bargained-for agreement.

### B. The No-Minimum-Order Clause Does Not Negate Consideration.

The contract does not contain a specific delivery schedule for rock salt, but that does not destroy its enforceability. Instead of a delivery schedule, the contract sets forth a process for buying rock salt through individual purchase orders. *See* Contract #3: Rock Salt & Liquid Calcium Chloride ¶ 3 (JA407) ("Members of the MCCPC may purchase items pursuant to the Contract by issuance of purchase orders."). Submission of a purchase order imposes certain obligations on Mid-American, such as delivery location[10] and delivery time,[11]

---

2 Corbin on Contracts § 5.28 ("The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract.").

[10] Bid Specifications at 1 (JA280) ("Delivery locations shall be to participating members of the MCCPC as specified at the time of ordering.").

[11] *Id.* ("Delivery for all categories is to be made to the members of the MCCPC within three (3) business days of receipt of order. . . .").

13

as well as consequences for failing to make the delivery as specified.[12]

The no-minimum-order clause is a critical feature of the purchase-order process. That clause generally prohibits Mid-American from imposing a minimum order requirement on council members: "No minimum order requirements are allowed, unless stated otherwise elsewhere." Bid Specifications at 1 (JA280). Through that provision, the members of the cooperative pricing council have flexibility to submit individual purchase orders in any amount (unless otherwise specified), but the clause does not release them from their estimated annual totals.

The operation of this clause can be explained through example. Suppose, for instance, that a council member estimated a delivery amount of 100 tons of rock salt for the year. Through the no-minimum order clause, unless the contract provided otherwise, that member could reach that total through five deliveries of twenty tons, ten deliveries of ten tons, a hundred deliveries of one ton, or any other combination. But that flexibility for each individual order would not absolve a council member of its obligation to purchase an estimated annual total of 100 tons of rock salt.

---

[12] *Id.* at 1-2 (JA280-81) ("Scheduled deliveries must be adhered to or rescheduled by 3:00 p.m. the day before the scheduled delivery[,] [or Mid-American shall face] [a] ten percent (10%) penalty of the total order. . . [F]ailure to accept orders and/or failure to comply with delivery requirements three (3) or more times shall constitute an act of default. . . .").

The Majority Opinion interprets the no-minimum-order clause to mean that the council members do not need to make *any* purchases throughout the year. *See* Maj. Op. at 18 (interpreting the non-minimum-order clause as "reliev[ing] a member with no salt needs of any obligation to purchase"). But the no-minimum-order clause and the promise to purchase estimated annual quantities are separate terms. I therefore disagree with the Majority Opinion and point out two additional concerns.

In my view, the Majority Opinion places undue significance on the no-minimum-order clause – so much so that the clause would overtake promises to purchase fixed quantities of rock salt. Suppose the same agreement except that the council members agreed to purchase exact quantities of rock salt. Would the no-minimum-order clause also render that agreement illusory? No, it would not. The process for submitting individual purchase orders is distinct from an obligation to purchase annual quantities. Yet under the Majority Opinion, a no-minimum-order clause, even in a contract specifying fixed annual quantities, would render the contract unenforceable. I find no support in New Jersey law for that unsettling proposition.

I also do not see the Majority Opinion as accounting for the contract's specified exception to the no-minimum-order clause. Mid-American cannot impose minimum order requirements "unless stated otherwise elsewhere." Bid Specifications at 1 (JA280). But this contract stated – through the council members' own bid specifications – that the minimum order for delivered bulk rock salt was 25 tons.[13] If

---

[13] *See* Bid Specifications at 3 (JA282) ("Deliveries must be made in truckloads of 25 tons or more.); *see also* Bid Proposal

15

nothing else, under the Majority Opinion's reasoning, that 25-ton minimum order amount should be enforceable.

For these reasons, I disagree with the Majority Opinion's reading of the no-minimum-order clause.

### C. The Quantity-Variation Provisions Do Not Undermine Consideration.

In holding that the council members' promise is illusory, the Majority Opinion relies heavily on the contract's quantity-variation provisions. Those all reinforce the same principle, *i.e.*, that the annual required quantities are estimates:

- This is an Open-Ended contract, meaning all items are specified with an *estimated quantity*.

- There is no obligation to purchase *that quantity* during the contract period, and *the actual quantity purchased by members of the MCCPC may vary*.

- *All quantities* may be more or less than *estimated*.

---

Form for Hunterdon County at 1 (JA321), (specifying that rock salt was to be delivered by truck "in 25 ton lots"); Bid Proposal Form for Passaic County at 1 (JA327) (same); Bid Proposal Form for Somerset County at 1 (JA330) (same); Bid Proposal Form for Sussex County at 1 (JA333) (same); Bid Proposal Form for Union County at 1 (JA336) (same).

Bid Specifications at 1 (JA280) (emphasis added). And as I understand New Jersey law, the presence of estimated quantities does not weaken but instead enhances the enforceability of a requirements contract. *See G. Loewus*, 65 A.2d at 606; *Tilcon*, 2014 WL 839122, at \*27.

The first quantity-variation term, the open-ended provision, does not undermine enforceability. If promises for open-ended required quantities were fatal to enforceability, then all requirements contracts would be illusory. *See generally* 2 Corbin on Contracts § 6.5 ("In a requirements contract, the quantity term is not fixed at the time of contracting."). But that is not the rule in New Jersey, where an open-ended promise for requirements, coupled with the duty of good faith, *see* N.J. Stat. Ann. § 12A:2-306(1), or even with "a reasonably accurate estimate" of the quantity to be purchased, *G. Loewus*, 65 A.2d at 606, may constitute adequate consideration.

The next provision – which underscores that council members need not purchase the quantities estimated – similarly does not reflect a phantom promise as the Majority Opinion suggests. *See* Maj. Op. at 18-19 (characterizing "the Council members' promise" as a promise "to buy salt in such quantities 'as may be desired' or as they 'may want'").[14] That clause

---

[14] *See also* 2 Corbin on Contracts § 6.5 ("[In a requirements contract], the buyer's promise is not illusory and it is, if bargained for, consideration for a return promise. It is not a promise to buy all that the buyer wishes or may thereafter choose to order. The amount is not left exclusively to the will of the promisor . . . [Instead,] [the contract] states a limitation

17

makes clear that the estimated quantities are just that: estimates, as opposed to fixed, certain amounts. If anything, this clause's reference to "*actual* quantity purchased," evidences the understanding that council members would purchase some *actual quantity* of rock salt. Certainly, a promise to purchase actual quantities is not an illusion.

The same holds true for the final quantity-variation provision that "[a]ll quantities may be more or less than estimated." Particularly in light of the duty of good faith, that clause presupposes the purchase of some non-zero quantity of rock salt. And if the promise were merely an illusion, then that clause would have stated that 'there is no obligation to make any purchase' – not that "all quantities" purchased may vary.

\* \* \*

Under New Jersey substantive law, a promise to pay for an estimated quantity of a required materials is enforceable. The contract at issue contained such a promise, and thus Mid-American's lawsuit should not have been dismissed.[15]

upon the promisor's future liberty of action. The promisor no longer has an unlimited option.").

[15] I also disagree with the Majority Opinion's conclusion that the Morris County Cooperative Pricing Council should be dismissed as a party to this appeal.

Rule 3 of Federal Appellate Procedure does not demand that a notice of appeal identify each appellee. Instead, it requires the appealing party to (A) specify the party or parties *taking* the appeal; (B) designate the judgment, order, or part thereof being

18

appealed; and (C) identify the court to which the appeal is taken. *See* Fed. R. App. P. 3(c). The notice of appeal – even without listing the council specifically – satisfies requirements (A) and (C). For subpart (B), I see no uncertainty about which order Mid-American appeals: the District Court granted only one contested motion by the council. Mid-American should not be faulted for not seeking reconsideration of that ruling because reconsideration does not operate as an exhaustion requirement for a valid appeal. And other than this case, I am unaware of any decision that has invalidated a notice of appeal due to a footnote in a separate motion for reconsideration. By contrast, precedent is replete with exhortations to "liberally construe[] notices of appeal." *Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 163 (3d Cir. 2017) (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010)); *see also Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 144 (3d Cir. 1998) (explaining that prior court orders are merged into the final judgment for purposes of appeal). For these reasons, the council should be a party to this appeal.